UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>BRUCE AINSLEY BERESFORD REDMAN,<br><br>A Fugitive from the Government of Mexico | Case No. CV 11-924-JSL (JC)<br><br>CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT |

The Court has received a Complaint in this matter, filed by the United States Attorney's Office for the Central District of California ("Complainant" or "the "United States"), acting on behalf of the Government of Mexico, pursuant to the Government of Mexico's request for the extradition of BRUCE AINSLEY BERESFORD REDMAN ("Beresford Redman"). The Court is also in receipt of a formal request for extradition, including supporting documentation submitted by the Government of Mexico.[1] The parties have submitted memoranda and evidence

---

[1] Complainant filed under seal an unredacted version of the formal request for extradition, bound with ribbon and seals, which is available to the Court, the Complainant and Beresford
(continued...)

1

in support of, and in opposition to extradition, which the Court has reviewed and considered.[2] On July 12, 2011, the Court conducted an extradition hearing at which Beresford Redman appeared with counsel.[3] The Court has carefully reviewed the evidence and arguments presented by the parties in their papers and at the extradition hearing and makes the findings set forth below.

    1.    The undersigned judicial officer is authorized to conduct extradition proceedings and has subject matter jurisdiction over the case. See 18 U.S.C. § 3184; Local Rule 72-1; General Order No. 05-07.[4]

    2.    The undersigned judicial officer has personal jurisdiction over Beresford Redman who is presently in custody in the Central District of California. See 18 U.S.C. § 3184.

    3.    An extradition treaty between the United States and Mexico (the "Extradition Treaty") is currently in force and was in force at all times relevant to this matter. See 31 U.S.T. 5059; 18 U.S.C. § 3181 (Historical and Statutory Notes); EM Ex. A at 1, ¶ 3; EM Ex. B.

---

[1](...continued) Redman. Complainant publicly filed photocopies of the English translations of the formal extradition documents redacting personal identifying information as required by Local Rule 79-5.4 and omitting the treaty between Mexico and the United States which is otherwise publicly available.

[2] Among other documents, the parties have submitted: (1) the United States' Extradition Memorandum ("Extradition Memo" or "EM") with exhibits ("EM Ex."); (2) Beresford Redman's Opposition to Request for Extradition ("Opposition" or Opp.") with supporting declarations of Richard G. Hirsch ("Hirsch Decl.") and Vicki I. Podberesky ("Podberesky Opp. Decl.") and exhibits ("Opp. Ex."); (3) the United States' Reply ("Reply") with a supporting declaration of Patricia Phillips ("Phillips Decl."); and (4) Beresford Redman's Request to Present Testimony at Extradition Hearing with a supporting declaration of Vicki I. Podberesky ("Podberesky Request Decl.").

[3] The Reporter's Transcript of the extradition hearing shall be referred to as "RT".

[4] General Order No. 05-07 is a successor to General Order No. 01-13 referenced in Local Rule 72-1.

4.      Beresford Redman has been charged in the State of Quintana Roo, Mexico with aggravated homicide. EM Ex. A at 4. Such crime is described by Articles 86 and 106(I) second and fourth paragraphs of the Penal Code of the State of Quintana Roo, in relation to Article 14 second paragraph thereof. EM Ex. A at 4; EM Ex. G at 1, 3, 4. The offense is punishable under Mexican law (Article 89 of the Penal Code of the State of Quintana Roo), under United States federal law (18 U.S.C. §§ 1111, 1112), and in the State of California (Cal. Penal Code §§ 187, 190) by deprivation of liberty, the maximum term of which is one year or greater. EM Ex. A at 2, ¶ 5; EM Ex. A at 4; EM Ex. G at 3, 4-6. The charge constitutes an extraditable offense within the meaning of the Extradition Treaty. 31 U.S.T. 5059, Article 2, paragraph 1 & Appendix, paragraph 1; EM Ex. B at 2, 8. Mexico seeks the extradition of Beresford Redman for trial of this offense. EM Ex. A at 1, ¶ 2; EM Ex. A at 3, 4.

5.      Sufficient evidence has been presented to establish probable cause that Beresford Redman, the individual appearing before the undersigned judicial officer, is the individual who has been charged in Mexico and whose extradition has been sought by the Government of Mexico in this action, and that Beresford Redman committed the offense for which extradition has been sought, namely the aggravated homicide of Monica Burgos Beresford Redman ("the victim").[5] See Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988) (describing

---

[5]Under the Penal Code of the State of Quintana Roo, whoever intentionally takes the life of another has committed aggravated homicide if the killing is committed by means of malice aforethought, lying in wait, unfair advantage, or treachery. There is malice aforethought if the offender has premeditated the commission of the intentional homicide. There is lying in wait whenever the victim is intentionally taken by surprise by means of threats. There is unfair advantage if the offender does not incur risk of death or injury by the victim. There is treachery if the trust promised to the victim, or the tacit trust that the victim should expect due to kinship, gratitude or friendship or any other relation which inspires trust with the offender is breached. EM Ex. C at 8-10; EM Ex. E at 1, 3.

probable cause, in the extradition context, as a standard involving an assessment of "whether there [is] any evidence warranting the finding that there [is] a reasonable ground to believe the accused guilty.") (quoting Fernandez v. Phillips, 268 U.S. 311, 312 (1925)).

      a)     Beresford Redman was married to the victim for approximately eleven years. The couple had two children, one male and one female. At the time of the alleged offense, the couple's son was three years old, and the couple's daughter was five years old. EM Ex. G at 4 (Beresford Redman 4/7/10 Statement).[6]

      b)     Beresford Redman had an affair with a co-worker for several months in at least 2009. He lied to the victim about it for months. The victim learned of Beresford Redman's infidelity when she discovered text messages between Beresford Redman and the co-worker. The couple quarreled about the matter. The victim told Beresford Redman to leave the couple's home. Beresford Redman moved out of the couple's home and into his parents' home. The victim denied Beresford Redman access to his children and to his home. She liquidated his money. She told his daughter's school that he was abusive and unfit and should not be allowed to pick up his daughter. The victim changed the locks on the house and took the couple's children to Hawaii without Beresford Redman. She planned to get a divorce. Beresford Redman was devastated about not being able to see his children and the possibility that he might have to prove that he was not abusive in a possible future custody battle. Upon his family's return from Hawaii, Beresford Redman apologized. EM Ex. G at 9 (Beresford Redman 4/7/10

///

///

---

[6] At the time of the extradition hearing, the couple's daughter was six years old. Podberesky Request Decl. ¶ 4.

4

Statement); EM Ex. J (email/text messages); EM Ex. L (Statement of Maria Beatriz Oaxaca).[7]

    c)    The couple decided to take a family trip to Mexico in early April 2010.[8] EM Ex. G at 9 (Beresford Redman 4/7/10 Statement).

    d)    The night before the family departed for Mexico, Beresford Redman and the victim had a big fight concerning Beresford Redman's affair. The couple had previously had many loud arguments.[9] EM Ex. L at 1 (Statement of Maria Beatriz Oaxaca).

    e)    On March 31, 2010, Beresford Redman, the victim, and the couple's children traveled to Cancun, Mexico. All four members of the family stayed in Room 7816 ("the Hotel Room") of the Hotel Moon Palace in Cancun (the "Hotel"). EM Ex. G at 4 (Beresford Redman 4/7/10 Statement).

---

[7] Statements of the victim's sister, Jeanne Ferreira Burgos ("Jeanne Burgos"), whose credibility Beresford Redman has vehemently attacked (RT 12-14), are essentially consistent with the above-referenced statements of Beresford Redman and Maria Beatriz Oaxaca and the email/text messages. According to Jeanne Burgos: The victim discovered that Beresford Redman was having an extra-marital affair in early 2010. The victim confronted Beresford Redman about his infidelity, which he acknowledged. The victim then withdrew assets from their joint bank account and moved them to a new account, over which she had sole control. When the victim discovered that Beresford Redman still had contact with the woman with whom he had been having an affair, the victim demanded a divorce. The victim told Beresford Redman that, if he agreed to the divorce, she would give him half the money she had transferred to the new account, but that if he did not agree to the divorce, she would keep all the money. The victim also changed the locks on the couples' residence and told Beresford Redman to stay away. The victim further notified the children's schools that Beresford Redman should not be allowed to pick the children up from school. EM Ex. H at 1-2; EM Ex. I at 1. The statements of Jeanne Burgos are largely cumulative of other evidence presented to the Court and are not themselves material to the Court's probable cause determination.

[8] The Complainant has presented evidence that Beresford Redman made the travel/hotel arrangements. EM Ex. K (Norma Ahif Statement); EM Ex. G at 4 (Beresford Redman 4/7/10 Statement). Beresford Redman has presented evidence that the victim made the travel/hotel arrangements. Opp. Ex. A. The identity of the person who made the travel/hotel arrangements is not material to the Court's probable cause determination.

[9] While Beresford Redman's daughter may not have heard and/or may have slept through her parents' arguments, the Court does not credit her statements (Opp. Ex. C at 2, ¶ 5j), to the extent offered to show that the victim and Beresford Redman never yelled at each other.

5

1  f) On the night of April 4, 2010, the victim and Beresford Redman argued.[10]

---

[10] According to Beresford Redman, the couple argued that night about activities for the next day (apparently in their hotel room). EM Ex. G at 6-7 (Beresford Redman 4/7/10 Statement).

According to a Hotel employee: A woman the Hotel employee identified from a photograph as the victim, and a man the Hotel employee identified from a photograph as looking similar to Beresford Redman, argued in front of the Los Tacos restaurant at the Hotel on April 4, 2010 at about 8:30 p.m. The woman was crying. The man twice attempted to physically assault the woman, but the man stopped when he realized that he was being watched. EM Ex. M at 2-3 (Statement of Erick Uriel Gonzalez Reyes).

Beresford Redman questions the credibility of the Hotel employee. RT 38-40; Opp. at 17. He has also requested that he be provided with any interview statements of two other employees who were with the Hotel employee in issue, intimating that the accounts of such individuals might be inconsistent with the account of the Hotel employee in issue and thus have impeachment value. Opp. at 7 n.9, 17, 20. However, even though, as Beresford Redman argues, the Court may properly assess the credibility and weight to be accorded the evidence properly before it (RT 14, citing Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir.), cert. denied, 479 U.S. 882 (1986)), Beresford Redman concedes that he may not offer contradictory, as opposed to explanatory evidence. RT 33; see Barapind v. Enomoto, 400 F.3d 744, 749-50 (9th Cir. 2005) (general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not) (citation omitted). Accordingly, even if Beresford Redman obtained and offered evidence that the two other employees who were with the Hotel employee in issue had given or would give accounts that differ from that of the Hotel employee in issue, such statements could not properly be considered by the Court. See Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008) (no error in refusing to allow fugitive to conduct discovery on credibility of witness as such evidence would not be admissible), cert. denied, 129 S. Ct. 1024 (2009). Thus, granting discovery of any such statements would not have appreciably advanced Beresford Redman's attempt to negate or explain the government's showing of probable cause. See Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1407 (9th Cir. 1988) (in exercising discretion to grant or deny discovery, extradition court should consider that extradition proceedings are not to be converted into dress rehearsal for trial and whether the resolution of the contested issue would be appreciably advanced by the requested discovery) (citations and quotations omitted), cert. denied, 490 U.S. 1106 (1989).

In any event, what is of most significance to the Court is the fact that the couple argued that night – something which Beresford Redman has conceded. Accordingly, even if it would be appropriate for the Court to consider evidence that contradicts the account of the Hotel employee

(continued...)

6

g) Around 6:00 a.m., on April 5, 2010, extremely loud banging and screams and cries for help, which sounded like a woman in extreme distress, emanated from the Hotel Room. The noises continued for around 15 minutes.[11] At approximately 8:30 a.m., Hotel guests reported the noises to the Hotel concierge. EM Ex. O; EM Ex. N at 1-2 (Statement of Bertha Angelica Arroyo Ramirez).

h) The concierge called the Hotel Room and spoke to Beresford Redman. Beresford Redman told the concierge that he had been arguing with his wife (the victim) about their children's behavior but that it would not happen again.[12] EM Ex. M at 2 (Statement of Bertha Angelica Arroyo Ramirez).

i) On April 5, 2010, a "Do Not Disturb" sign hung on the door to the Hotel Room from at least 8:30 a.m. to at least 5:00 p.m., and thus, the Hotel Room was not serviced by the Hotel's cleaning staff that day. At one point that afternoon (around 2:00 p.m.), the Hotel employee assigned to clean the room encountered Beresford Redman coming out of the Hotel Room and asked

///

///

---

[10](...continued) in issue, this would not alter the Court's determination regarding the existence of probable cause. Similarly, even though the Court would find probable cause irrespective of the statements of Jeanne Burgos, the Court notes that the fact that Beresford Redman and the victim argued on the night of April 4, 2010, is consistent with Jeanne Burgos' statement that the victim told her, on that date, that the victim had discovered that Beresford Redman was still receiving communications from the woman with whom he had been unfaithful. EM Ex. I at 2.

[11] It can reasonably be inferred that Beresford Redman incapacitated or killed the victim during this time period.

[12] On April 8, 2010, Beresford Redman also told Mexican authorities that on April 5, 2010 at about 8:30 a.m., he had had "a strong argument with his wife due to the behavior of his children." EM Ex. R at 2.

7

Beresford Redman if he wanted his room cleaned. Beresford Redman indicated that he did not. EM Ex. C at 15 (Statement of Carlos Mario Vazquez Olan).

j) Records from the Hotel's keycard system, (which logs the time of keycard entries into Hotel rooms), reflect that between April 5, 2010, at 9:02 p.m., and April 6, 2010, at 4:22 a.m., fifteen entries were made into the Hotel Room, including five entries between 9:02 p.m. and 11:00 p.m. Specifically, the records reflect that entries were made into the Hotel Room at 9:02 p.m., 9:28 p.m., 9:31 p.m., 9:35 p.m., 10:25 p.m., 11:01 p.m, 11:19 p.m., 12:33 a.m., 12:54 a.m., 1:58 a.m., 2:54 a.m., 3:34 a.m., 4:04 a.m., 4:09 a.m., and 4:22 a.m. EM Ex. R at 4-13.

k) On the morning of April 6, 2010, Beresford Redman told Hotel employees that his wife was missing. He later reported her disappearance to the U.S. Consulate and the local prosecutor. On that date he told Mexican authorities the following: He had last seen the victim on April 5, 2010, between 8:30 and 9:00 a.m. The victim had been planning to do some shopping in Cancun and perhaps to go to the Hotel spa. The victim wanted to find a place where she could find an activity involving swimming with dolphins that might be suitable for the couple's children. The victim had approximately $400 U.S. in cash and at least a Chase Slate Visa credit card. He had expected the victim to return around 10:00 p.m. on April 5, 2010. His wife had been wearing a golden band. EM Ex. F at 1-2 (Beresford Redman 4/6/10 Statement).

l) Mexican authorities observed excoriations (scratches or abrasions) on the fingers of both of Beresford Redman's hands, on the back part of his neck, behind his right ear, on his chest, and on the tibia of his left leg. The wounds seemed to have been inflicted by fingernail scratches. A criminalistics expert opined that the nature of the injuries supported the inference that they were caused during a fight. EM Ex. R at 2; EM Ex. W at 13.

8

1    m) On April 7, 2010,[13] Beresford Redman made additional
2 statements to the Mexican authorities, including the following:
3          i. On the night of April 4, 2010, he and the victim argued
4 about activities for the next day. EM Ex. G at 6-7.
5          ii. Beresford Redman did not sleep well the night of April
6 4, 2010, and visited the bathroom constantly throughout the night. His activities
7 caused the victim and his son to awaken around 5:00 a.m. The three of them
8 stayed awake until around 6:30 a.m. The three of them played a game named
9 Mater that consisted of crashing against the wall, using the bed or any other
10 object. The couple's son was laughing and screaming during the game. They
11 were making a lot of noise during the game, jumping on the floor and bed. The
12 couple's daughter slept all this time. After Beresford Redman, the victim and their
13 son stopped playing, they fell asleep. At around 8:30 a.m., the victim left the bed
14 and Beresford Redman and his son got up and watched a DVD movie while the
15 victim got ready to leave. The victim left around 8:30 a.m. with $400 U.S. and
16 around $100 in Mexican pesos and was wearing a blue dress. EM Ex. G at 7.
17         iii. Beresford Redman denied telling the concierge that
18 he had been fighting with the victim on the morning of April 5, 2010. He told
19 Mexican authorities that he knew nothing about screams asking for help and that
20 the only screams coming from the room were ones made when he, the victim, and
21 their son (not their daughter) were playing. He further asserted that when, on
22 April 5, between 9:00 and 9:30 a.m., the concierge called and advised him of a
23 noise complaint, he apologized and told the concierge that he had been playing
24 ///
25 ///

---

[13] Beresford Redman points out that this interview may have actually taken place on April 8, 2010. Opp. at 8 n.11. The date on which the interview occurred is not material to the Court's probable cause assessment.

9

with his son, that they had been screaming and making noise, and that it would not happen again. EM Ex. G at 9 (Beresford Redman 4/7/10 Statement).[14]

        iv.    Beresford Redman stayed with his children while the victim was out that day (April 5, 2010). He was sleeping at 10:00 p.m. with the children and expected that the victim would wake him up when she arrived

---

[14] The Court finds Beresford Redman's statements not credible in light of the inconsistency between such statements and the statements of the concierge and the description of the screams by the Hotel guests and the fact that the concierge and the Hotel guests have no apparent motive to fabricate, whereas the same cannot be said of Beresford Redman.

The statements of Beresford Redman's daughter, which have been offered in opposition to the extradition request, do not alter the Court's assessment. Although Beresford Redman's daughter may well have participated in playing noisy games with her family and may have seen her mother leave the Hotel Room in a blue dress at some point during the family's trip, the Court does not credit the child's statements to the extent they are offered to corroborate Beresford Redman's version of the events or independently to explain the noise emanating from the Hotel Room on the morning of April 5, 2010, or to exculpate Beresford Redman. First, the child does not state that the events recounted occurred on the morning in issue. Opp. Ex. C at 2, ¶ 5e; Podberesky Request Decl. ¶¶ 4b, 4c. Indeed, immediately after she refers to playing noisy games in the room, she refers to watching a movie "that night," and then to the victim leaving in a blue dress while they were still playing the game (though during the second interview she apparently stated that her mother left after they played the game). Opp. Ex. C at 2, ¶¶ 5f-5h; Podberesky Request Decl. ¶ 4c. Nor does the child indicate that this was the last time she saw her mother. Opp. Ex. C at 1-2, ¶ 5. Although Beresford Redman's counsel argues that the child must have been referring to the morning in issue based on the description of the blue dress the victim was wearing (RT 42), there is no evidence before the Court that the victim did not wear a blue dress at other points during the trip and, in any event, the Court has only Beresford Redman's word – which the Court does not credit – that the victim wore a blue dress on the morning in issue. Second, Beresford Redman himself described the game, on the morning in issue, as having been played with the victim and his son and made no mention of his daughter participating in such activities. EM Ex. G at 7. To the contrary, he affirmatively stated that his daughter was sleeping the whole time. EM Ex. G at 7. Moreover, Beresford Redman's statement suggests that the victim left the hotel room while he and his son were watching a movie – not while they were playing a game as his daughter has stated. EM Ex. G at 7; Opp. Ex. C at 2, ¶¶ 5g. Third, Beresford Redman's six-year-old daughter's statements were made more than a year after the events in issue. Opp. Ex. C (June 6, 2011); Podberesky Request Decl. ¶ 2 (July 5, 2011). Finally, as a matter of common sense, the Court does not discount the bias/natural inclination of a child, particularly a young child living with her father's parents (Opp. Ex. C at 1, ¶ 4) and undergoing therapy by the same psychotherapist treating her father (Phillips Decl. ¶ 2), to want to assist, or to feel pressured to assist her father (irrespective of whether any overt pressure has been applied by third parties).

10

because he thought, but was not sure, that she had a key. He awoke around 11:00 p.m. and noticed that the victim had not arrived yet. He felt distressed but knew that she sometimes ran late. He noticed that the victim did not have her cell phone so he could not call her. Since he was so worried, he walked around the Hotel to look for her. He went in and out of the room several times but never spoke to anyone at the Hotel or reported the victim missing that night.[15] He returned to his room and eventually fell asleep around 5:00 a.m.[16] EM Ex. G at 8.

    v.  The couple had life insurance polices. If the victim died, the children would receive $500,000 each. EM Ex. G at 9.

    vi.  He suffered injuries to his hands and feet on April 2, 2010 at the subterranean river in Xcaret when, after his son asked to get out of the river, Beresford Redman climbed a slippery rocky river wall with his son in his arms.[17] EM Ex. G at 5 (Beresford Redman 4/7/10 Statement).

---

[15]The Court finds Beresford Redman's account not credible as it is inconsistent with the Hotel's keycard records and common sense. Specifically, although Beresford Redman told authorities that he awoke and began looking for the victim around 11:00 p.m., the keycard records reflect five entries into the room before 11:00 p.m. – including four entries between 9:02 and 9:35 p.m. – before, according to Beresford Redman, the victim had even planned to return. Moreover, it does not make sense that Beresford Redman would not have checked with Hotel staff during the night/early morning hours if he had actually been searching for his wife at that time (as opposed to disposing of evidence).

[16]The Court infers that the children of Beresford Redman and the victim were alone in the Hotel Room when Beresford Redman left the room on multiple occasions in the late hours of April 5, 2010 and the early hours of April 6, 2010 and does not credit the statements of Beresford Redman's daughter (Opp. Ex. C at 1, ¶ 5d) to the extent offered to show that the children were never left alone in the Hotel Room.

[17]Beresford Redman's daughter has stated that she was on Beresford Redman's back at the underground river, that her father helped both she and her brother out of the water, that it was rocky, that her father got scratches on his arms and legs while helping them out of the water, and that later she put bandaids on her father's scratches. Podberesky Decl. ¶¶ 2, 4a. The Court notes that Beresford Redman himself said nothing about carrying his *daughter* or incurring injuries while assisting his *daughter* in getting out of the river. As discussed in note 14, supra, the Court
                           (continued...)

11

vii. He suffered injuries to the back part of his neck on April 4, 2010 during a Jungle Tour when, after diving into the water, he hit the back part of his head on a rope holding a boat. EM Ex. G at 5-6.

n) According to a Hotel security employee: The Hotel maintains very strict entrance and exit registry for its guests. As to the exit procedure, every Hotel guest leaving the property is identified. The security employee covered the 8:00 a.m. to 7:00 p.m. shift from Monday to Saturday. He had never seen the victim until being shown a video of her in connection with carrying out a search for her.[18] EM Ex. P (Statement of Rodolfo Mogo Almeida).

o) On April 8, 2010, a Hotel employee found the victim's naked body in a sewage cistern on the Hotel grounds. The cistern was approximately 25 meters from the building where the Hotel Room was located. The victim's purse was near the body. Among other things, the purse contained approximately $15 in pesos. The victim's gold band was also recovered.[19] The purse did not contain the

---

[17](...continued)
has concerns about the credibility of Beresford Redman's daughter's statements. However, the child's foregoing statements, even accepted as true, do not explain all of Beresford Redman's scratches and do not alter the Court's view that probable cause exists to believe that Beresford Redman committed the aggravated homicide of the victim.

[18]As Beresford Redman's counsel has pointed out, the security employee in issue was also on duty earlier in the week when, if Beresford Redman and his daughter are to be believed, the family (including the victim), left the Hotel grounds. RT 45-46; EM G at 4-6 (Beresford Redman 4/7/10 Statement); Podberesky Request Decl. ¶ 4a. Accordingly, Beresford Redman's counsel argues that the statement of the employee in issue – at least to the extent offered to demonstrate that the victim never left the Hotel grounds on the date in issue – is unreliable Opp. at 7; RT 45-46. Irrespective of the statements of Beresford Redman and his daughter, evidence that the victim did not actually leave the Hotel grounds on April 5, 2010 does not, in this Court's view, make it any more or less likely that Beresford Redman killed the victim or that he lied about the victim's plans to leave the grounds.

[19]If the victim had been robbed and had been killed by a robber, it does not make sense that any money or jewelry would have been left behind.

victim's passport, the victim's cell phone, a credit card, or a Hotel keycard.[20] EM Ex. D at 44 (Arrest Warrant); EM Ex. R at 1-2 (Investigation Report); EM Ex. S at 1-2 (Statement of Enrique Arena Lopez); EM Ex. T at 2-7 (Corpse and Removal Proceedings).

    p)    A Mexican criminalist opined that the place and position in which the victim's body was found did not correspond to the original position of her death and that her death had occurred approximately 72 to 96 hours prior to such investigator's intervention on the morning of April 8, 2010. EM Ex. W at 1, 18.

    q)    An autopsy was conducted on the victim's body. The autopsy noted a "chop wound" to the right side of the victim's head which was believed to be related to the time and date of her death. The forensic pathologist opined that the likely cause of the victim's death was asphyxia through suffocation.[21] A subsequent forensic review of the victim's body reached essentially the same conclusion about her cause of death.[22] The subsequent reviewer opined that the above-referenced head wound had been produced by a direct contusion

---

[20] According to Jeanne Burgos, the victim would never have left for the day without her telephone, especially if she was not taking her children with her. EM Ex. I at 2. Irrespective of Jeanne Burgos' statement, common sense suggests that a parent, shopping in a foreign country outside the presence of her children, would not intentionally leave her cell phone behind in a Hotel room.

[21] The forensic pathologist who conducted the initial autopsy also opined that the event causing death likely took place at approximately 11:40 p.m. on April 5, 2010, at the water cistern where the victim's body was found, whereas, as noted above, a criminalistics expert opined that the place and position in which the victim's body was found did not correspond to the original position of her death. EM Ex. U at 5; EM Ex. W at 18.

[22] The subsequent medical examiner viewed the victim's body and discovered several additional wounds, including ecchymoses (superficial contusions) to the victim's face caused by a blunt sharpless object of irregular shape, hard and with ledges, maybe a closed fist. The color of such ecchymoses suggested that they had been caused two or three days before the victim's death. EM Ex. V at 1-2, 4, 7, 8.

13

mechanism, by applying a force and direction that are compatible with a hard and solid object with irregular edges such as a metallic pipe, baseball bat, or stick. EM Ex. U at 1-3; EM V at 5, 8, 9.

    r)    On April 9, 2010, forensic examiners searched Beresford Redman's Room.

    i.    In the bathroom, forensic examiners noticed small spotting on the column of the washbasin (item nos. 1-7). Using a Kastle-Meyer reagent test, examiners determined that several of these samples tested presumptively positive for the presence of blood. EM Ex. X at 2-3, 5.

    ii.    Forensic examiners found a reddish stain on one of the bed pillows (item no. 8 [23MI8089]). Examiners later tested this stain for DNA and determined that it was consistent with human male blood. EM Ex. X at 3; EM Ex Y at 4, 7.

    iii.    Forensic examiners found additional stains on the handrail of the balcony to The Hotel Room from which three samples were taken (item nos. 16 [23MI8090], 17 [23MI8091 or 23MI8092], 18).[23] EM Ex. X at 4. All three of these samples tested presumptively positive for the presence of human blood under the one-step Enzymatic Immunoassay with kits ABA card Hema Trace test. EM Ex. X at 4, 5. At least two such samples (item nos. 16, 18) likewise initially tested positive for blood under the Kastle-Mayer reagent test.[24]

---

[23] The Court notes that item no. 17 is assigned both sample code numbers 23MI8091 and 23MI8092 in EM Ex. X at 2-3, whereas item no. 18 does not appear to have been assigned a sample number in EM Ex. X. Although not material to the Court's probable cause determination, it appears likely that EM Ex. X contains a typographical error and that item no. 17 was assigned sample code number 23MI8091 and item no. 18 was assigned sample code number 23MI8092.

[24] The initial Kastle-Meyer reagent test results were reported as testing positive for item nos. 16, 18 and 19, even though the report in issue does not otherwise assign item no. 19 to any
(continued...)

14

EM Ex. X at 4, 5. However, at least two of the samples taken from the washbasin column (item nos. 16 and 17) subsequently tested negative for blood under the Kastle-Meyer reagent test.[25] EM Ex. Y at 2, 4.

      s.    On or about April 7, 2010, Mexican law enforcement officials told Beresford Redman not to leave the city (Cancun) for any reason. Beresford Redman surrendered his passport to Mexican authorities. On an unknown date, Beresford Redman left Mexico and re-entered the United States. Mexican records do not reflect his departure date or border-crossing location. EM Ex. C at 38; EM Ex. G at 11; EM Ex. T at 4.

    6.    The Court finds that it can reasonably be inferred from the foregoing facts that on the morning of April 5, 2011, Beresford Redman killed (or incapacitated and subsequently killed) the victim, that he kept the Hotel cleaning staff from entering the Hotel Room to afford him time to attempt to sanitize the crime scene and to conceal his crime, that he disposed of the victim's body during the night of April 5, 2010/the early morning hours of April 6, 2010, that he made inconsistent and false statements to Hotel employees and the Mexican authorities about these events, and that such inconsistencies and falsehoods are indicative of a consciousness of guilt. The Court has considered all of the evidence presented by the parties, including evidence proffered by Beresford Redman which may well not be properly admissible[26] and the statements of Jeanne Burgos and Erick Uriel

---

[24](...continued)
sample taken. EM Ex. X at 4. Although not material to the Court's probable cause determination, it appears likely that the reference to item no. 19 is a typographical error and was instead, intended to refer to item no. 17.

[25]See supra note 23.

[26]For example, Beresford Redman presents evidence regarding other crimes committed against guests of the same hotel involved here and of asserted deficiencies in the investigations of such crimes. Hirsch Decl. ¶¶ 2-4; Opp. Ex. F. He further presents evidence regarding political
                                                                                         (continued...)

Gonzales Reyes, the credibility of which has been challenged by Beresford Redman. In light of Beresford Redman's challenge to the statements of Jeanne Burgos and Hotel employee Erick Uriel Gonzalez Reyes, and this Court's denial of his discovery requests which are largely predicated thereon, the Court notes that irrespective of such statements, probable cause exists to believe that Beresford Redman committed the aggravated homicide of the victim.

7. Based on the foregoing findings, the Court concludes that Beresford Redman is extraditable for the offense for which extradition has been requested, and hereby certifies this finding to the United States Secretary of State as required under 18 U.S.C. § 3184.

IT IS THEREFORE ORDERED that a certified copy of this Certification of Extraditability and Order of Commitment and a certified copy of the other records and transcript of these proceedings be forwarded without delay by the Clerk of the Court to the Secretary of the State, Department of State, to the attention of the Office of the Legal Adviser.

IT IS FURTHER ORDERED that Bruce Ainsley Beresford Redman is committed pursuant to 18 U.S.C. § 3184 to the custody of the United States Marshal for the Central District of California, or his authorized representative,

///
///
///

---

[26](...continued)
corruption in Cancun and the State of Quintana Roo. Opp. Ex. G. Based on such evidence, Beresford Redman questions the motives and investigation of Mexican authorities in connection with his own case. Opp. at 8-10. While the Court believes consideration of such evidence is precluded by the rule of non-inquiry (see, e.g., Lopez-Smith v. Hood, 121 F.3d 1322, 1327 (9th Cir. 1997), superseded by regulation on other grounds), the Court nonetheless notes that consideration of such evidence does not alter this Court's view that the probable cause requirement has been satisfied.

there to remain pending final disposition of this matter by the Secretary of State and surrender to designated agents of the Government of Mexico.

IT IS SO ORDERED.

Dated: July 25, 2011

/s/
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE